CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
SEP 17 2012
JULIA C. DUDLEY, CLERK
BY: /s/ Linda Bright
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MICHAEL J. OSBORNE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 3:12CV00009 |
| v. | ) |
| | ) **MEMORANDUM OPINION** |
| HARTFORD LIFE AND ACCIDENT | ) |
| INSURANCE COMPANY, | ) By: Hon. Glen E. Conrad |
| | ) Chief United States District Judge |
| Defendant. | ) |

In this action, brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, plaintiff Michael J. Osborne claims that defendant Hartford Life and Accident Insurance Company ("Hartford") wrongfully terminated his long-term disability benefits and his waiver of premium coverage under a group life insurance policy issued by Hartford. The case is presently before the court on the parties' cross-motions for summary judgment. For the reasons set forth below, both motions will be denied and the case will be remanded to Hartford for a full and fair review of Osborne's continued eligibility for benefits.

**Factual and Procedural Background**

Osborne previously worked as a heavy equipment operator for Ennis Electric Company, Inc. ("Ennis"). As an employee, Osborne participated in Ennis's Group Benefit Plan ("the Plan"), which was issued and administered by Hartford. The Plan provided short-term disability, long-term disability, and life and accidental death and dismemberment benefits. Under the terms of the long-term disability policy, Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions . . . ." (Administrative Record ("AR") 992.)

Osborne was injured in an automobile accident in 2003. In 2004, he underwent an anterior discectomy and cervical fusion. Osborne's neck problems continued and he underwent a second discectomy and cervical fusion in 2006. He later underwent an additional surgery to correct problems caused by the second procedure.

Osborne subsequently applied for, and received, long-term disability benefits from October 28, 2006 through October 27, 2008. On May 1, 2008, Hartford requested additional documentation from Osborne to evaluate whether he would continue to qualify for benefits on and after October 28, 2008. Hartford explained in a letter to Osborne that the Plan's definition of "disability" or "disabled" changes after a participant receives benefits for twenty-four months. (AR 858.) After twenty-four months, the determination of whether a claimant is disabled shifts from an evaluation of the claimant's ability to perform the essential duties of his occupation, to an evaluation of the claimant's ability to perform the essential duties of "Any Occupation." (AR 993.) The Plan defines "Any Occupation" as "an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance." (Id.) The Plan defines "Essential Dut[ies]" to include the ability "[t]o be at work for the number of hours in your regularly scheduled workweek." (Id.)

Hartford subsequently contacted one of Osborne's treating physicians, neurologist Amy H. Traylor, M.D., and requested that she complete an Attending Physician's Statement and submit copies of her most recent examination notes. Dr. Traylor completed the Attending Physician's Statement on August 11, 2008, listing Osborne's primary diagnosis as cervical spine degenerative disc disease and his secondary diagnosis as cervical neck pain. (AR 464-65.) Dr.

Traylor noted that Osborne also suffers from migraine headaches, and numbness and pain in his upper extremities and hands. Dr. Traylor opined that Osborne can sit and stand for only fifteen minutes at a time and for a total period of two hours per day; that he can occasionally lift or carry no more than ten pounds; that he has limited reaching abilities; and that he is permanently disabled. (AR 465.)

By letter dated September 11, 2008, Hartford advised Osborne that it had reviewed all of the medical and vocational information in his claim file to determine whether he would be eligible for benefits under the Any Occupation definition of disability. Based upon that review, Hartford concluded that Osborne satisfied the definition and that he would "continue to qualify for benefits on and after October 28, 2008." (AR 827.) Hartford noted, however, that Osborne would be responsible for providing continued proof of disability, and that it would periodically contact him for additional information.

In April of 2009, Hartford attempted to contact Osborne for the purpose of conducting a "milestone" interview. (AR 719-20.) After several attempts to reach him were unsuccessful, Hartford referred the matter for investigation. The investigation included video surveillance, an in-home interview, the receipt of additional records from Osborne's treating physicians, a medical records review by an independent neurologist, and an employability analysis.

On June 1, 2009, Hartford hired a private investigator, who conducted video surveillance of Osborne from approximately 6:00 a.m. until 4:00 p.m. on June 11, 2009 and June 12, 2009. On June 11, 2009, Osborne was not observed by the private investigator. However, on June 12, 2009, the investigator recorded Osborne driving to a private residence and performing yard work over an approximately two-hour period. Osborne was observed using a gas-powered weed trimmer, lifting a wheelbarrow out of the bed of his truck, and shoveling mulch from a trailer

3

into the wheelbarrow. He was then seen emptying the mulch into flower beds and spreading the mulch with a rake. Osborne was also observed lifting the tailgate of his truck and a trailer, removing a power washer from the bed of his truck, bending at the waist, squatting, kneeling, and using a shovel and a hammer. Osborne appeared to perform all of the physical activities without restriction or limitation.

On June 17, 2009, Osborne was examined by Dr. Traylor. Following the examination, Dr. Traylor completed another Attending Physician's Statement for Hartford. (AR 492.) Dr. Traylor listed Osborne's subjective symptoms as migraine headaches, bilateral upper extremity pain, bilateral shoulder pain, neck pain, lower back pain, and upper extremity parasthesia. The physical examination findings included "all extremity weakness" and bilateral hand numbness. (Id.) Dr. Traylor opined that Osborne is capable of sitting for less than one hour at a time, and standing and walking for less than fifteen minutes at a time, for a maximum of one to two hours per day. She also opined that Osborne can only occasionally lift up to ten pounds, and that he has limited reaching and handling abilities. Dr. Traylor continued to opine that Osborne is permanently disabled.

On September 22, 2009, a Hartford representative interviewed Osborne at his home. During the interview, Osborne was shown the surveillance video from June 12, 2009, which recorded him performing yard work. Osborne advised the representative that he performed the work to help a friend prepare for a graduation party, and that he experienced a high level of pain the following day as a result of overexerting himself.

Hartford's medical case manager subsequently contacted Osborne's treating physicians and provided the surveillance results for their review. In her response, Dr. Traylor indicated that she remained convinced that Osborne is unable to perform the level of physical activity required

4

for gainful employment. Nonetheless, Dr. Traylor recommended that Osborne undergo a "functional capacity evaluation for formal testing," since "the issue of his capacity to work has been raised." (AR 392.)

Rather than referring Osborne for a functional capacity evaluation, Hartford sent Osborne's medical records to Douglas T. Brown, M.D., a neurologist, for the performance of a "peer review." (AR 308-12.) In his report, Dr. Brown summarized the medical records in Osborne's case file, including MRI examinations performed three years earlier and an electromyography and nerve conduction study performed in April of 2009. The MRI of Osborne's lumbar spine showed mild degenerative changes, and the MRI of Osborne's cervical spine was negative except for a prior surgical fusion at C5-6. The electromyography and nerve conduction study was "normal . . . except for mildly prolonged median sensory latencies compatible with early or mild bilateral carpal tunnel syndrome." (AR 478.) Dr. Brown also summarized Dr. Taylor's treatment notes and the surveillance video recorded on June 12, 2009.

According to his report, Dr. Brown was tasked with determining Osborne's "current maximal level of function" and "any restrictions/limitations supported by the information." (AR 311.) In response, Dr. Brown concluded that Osborne has "no substantiated functional impairment other than his mild carpal tunnel syndrome." (Id.) Based on that impairment, Dr. Brown opined that Osborne "should not be required to perform continuous, unchanging, repetitive use of the hands for longer than 15 minutes unless allowed a 5 minute break from such use of the hands after every 15 minute period of that activity." (Id.) To the extent Osborne complained of chronic pain and numbness in his neck, shoulders, and arms, Dr. Brown concluded that these complaints were "supported only by the claimant's subjective complaints," and that their validity was "brought into question in light of the video recording." (Id.) Dr.

Brown emphasized that the surveillance video showed Osborne being "quite physically active for a sustained period of time performing medium manual labor . . . ." (Id.)

Following the completion of Dr. Brown's report in December 15, 2009, Hartford requested the performance of an employability analysis. Based on Osborne's education and work history, and the report prepared by Dr. Brown, the analyst made the following adjustments to Osborne's "ability profile":

- Strength remained at Medium Level
- Climbing and crawling were adjusted to frequently
- Fingering and feeling were adjusted to constantly
- Noise level remained at loud
- Work Situations of Performing a variety of duties was adjusted to "yes" as Mr. Osborne would have demonstrated this skill in his work history
- Data adjustments of Computing and copying were adjusted to "yes" as Mr. Osborne would have demonstrated these skills in his work history as foreman and heavy equipment operator and are lesser skills than the level he has demonstrated in this industry
- People adjustments of Serving were adjusted to "no" as Mr. Osborne would not have demonstrated this skill in his work history
- Things adjustments of Operating – controlling, tending and handling were adjusted to "yes" as Mr. Osborne would have demonstrated these skills in his work history
- All other Physical Demands, Environmental Conditions, Aptitudes, Work Situations and Work Functions remained at Pre-disability levels

(AR 375.) Applying this profile, the analyst identified a number of occupations that could be performed by Osborne, and which would meet the requisite earnings potential: taper, derrick operator, monorail crane operator, tower-loader operator, tractor-crane operator, utility worker, and wheel and castor repairer. (Id.)

By letter dated January 12, 2010, Hartford advised Osborne that it was terminating his long-term disability benefits. Hartford indicated that it had "concluded from the combination of all the information in [Osborne's] file that [he is] able to perform work on a 40 hour a week basis, with the restrictions and limitations to the upper extremities as outlined by Dr. Brown."

(AR 922.) Given the results of the employability analysis, Hartford determined that Osborne is "not prevented from performing the essential duties of Any Occupation" and, thus, that he "no longer meet[s] the policy definition of disability." (Id.) In conjunction with this decision, Hartford also terminated the waiver of premium benefits under Osborne's life insurance policy.[1] (AR 261-266, 1009.)

Osborne subsequently appealed Hartford's decision in accordance with the Plan's appellate procedure. On appeal, Osborne specifically argued that he is "not able to work a consistent 8 hour day" and that Hartford improperly relied on the surveillance video. (AR 1027-28.) To support his arguments, Osborne submitted a functional capacity evaluation report prepared by V. Robert May, III, Rh.D., and an additional statement from Dr. Traylor.

Dr. May performed the functional capacity evaluation on January 7, 2010. The evaluation lasted eight and a half hours, and included an interview, testing, and a physical examination. Osborne completed all of the assigned test activities, and Dr. May specifically noted that there was "no doubt" that Osborne "gave his best effort to comply with the testing components." (AR 44.) During the testing, Osborne "demonstrated significant instability in his cervical strength study for flexion and extension motions" (AR 41), and he exhibited "mechanical and strength deficits in range of motion and dynamic activities." (AR 42). Based on the examination, Dr. May described Osborne's overall condition as "simply a 'mess' with a guarded and poor prognosis for returning to the competitive labor market." (AR 43.) He determined that Osborne "cannot function independently in the competitive labor market without accommodation and worksite modification." (AR 42) Specifically, Dr. May opined that Osborne would require the following limitations:

---

[1] Under the Plan, Osborne's life insurance premium "will no longer be waived" if, for any reason, he is "no longer Disabled." (AR 1009.)

7

1. Physical Demand Characteristic (PDC): Light Work @ 20 pounds for occasional Lift and in restricted work plane, and 10 pounds frequent lift within restricted plane; Sedentary work at 10 pounds maximum lift within unrestricted work plane.

2. Climbing: Avoid climbing ladders altogether and avoid climbing stairs repeatedly.

3. Kneeling and Crouching: Avoid either if possible, but if the essential function calls for this posture, then perform it sporadically, and not on a frequent schedule.

4. Sitting and Standing: Avoid prolonged posturing and allow for periodic adjustments while working.

5. Walking: Avoid uneven terrain, and only walk in areas that are absent of any barriers or hazards on the ground.

6. Balance and Height: Avoid working at heights and using balance to perform the essential functions of the job.

(AR 43.)

Dr. Traylor prepared a written statement on July 26, 2010, in which she expressly addressed the surveillance footage of Osborne performing yard work. Dr. Traylor noted that she had "consistently stressed to [Osborne] that he is disabled and that he needs to not perform any physical exercise or do any work," and that she was convinced "that he did this out of his feelings of being helpless and not being supportive of his family and his neighbors." (AR 141.) Dr. Traylor also noted that she was confident that Osborne "suffered physically for an extended period of time" and was in "considerable pain" after performing the yard work. (Id.) Dr. Traylor concluded by emphasizing that she remains convinced that Osborne is totally disabled. Dr. Traylor noted that Osborne is not able to work on a consistent basis, and that he "may be able to work one or two days but then he might be laid up for several days after that." (Id.)

After receiving the additional evidence submitted with Osborne's letter of appeal, Hartford "determined that further review by [an] appropriate medically trained professional was warranted" to address "issues relating to Mr. Osborne's condition and functional status." (AR 901.) Rather than arranging for an independent examination, Hartford elected to forward Osborne's file to the University Disability Consortium for another paper review. That review was performed by Beatrice Engstrand, M.D. on October 28, 2010. (AR 3-12.)

Dr. Engstrand determined that Osborne is capable of working "full-time, consistently, with restrictions no more than medium level work," and that he can work "a full workday, five days a week." (AR 11.) While the report summarily states that her opinion was "based upon all the information provided" (Id.), Dr. Engstrand focused almost exclusively on the surveillance video to support her conclusion that Osborne is capable of performing a full range of medium work on a full-time basis:

> **FINAL ASSESSMENT:** Mr. Michael Osborne can work full-time, consistently, with restrictions no more than medium level work. He can work a full workday, five days a week. The analysis is based upon all the information provided, objective and subjective data. In my opinion, the claimant can perform medium level activity. There is objective data to place restrictions on him above the medium level activity; however, taking into account the totality of the information available, <u>especially the video documentation</u>, it is my opinion the claimant is precluded from working beyond the medium level, but he is capable of doing medium level work without restrictions. His <u>video surveillance</u> shows him moving fine, no limping, no loss of balance, no guarding of his neck, good range of motion, good arm strength. <u>He looks great in the video.</u> He has ongoing pain complaints; <u>however, he is able to do work around the lawn.</u> I do not see any evidence of decreased concentration or attention as a result of his reported pain complaints. He is able to talk to the interviewer fine, follow out activities, <u>do weeding, doing activities around the yard</u>. There is no evidence to suggest that he suffers from medication side effects that would impair his ability to function in a work setting. <u>He is able to do work around the yard, wrapping up hoses, lifting a wheelbarrow, bending, stooping, balancing, and walking with perfect arm swing, normal range of motion seen in his neck movements.</u> In my opinion, he maintains the functional capability to consistently perform work related activities on a sustained basis at a medium level eight hours a day for 40 hours a week without restrictions.

9

(AR 12) (emphasis added).

On November 2, 2010, Hartford sent Osborne a letter denying his appeal. The letter notes, in summary fashion, that Osborne included a functional capacity evaluation with his appeal request. Without discussing the results of the functional capacity evaluation or the additional submission from Dr. Traylor, Hartford relied upon Dr. Engstrand's report to conclude that Osborne "is physically capable of performing medium physical-demand-level work on a full-time basis without restriction." (AR 902.) Since Dr. Engstrand's assessment of Osborne's functional capacity would not preclude him from performing the occupations previously identified in the employability analysis, Hartford upheld its decision to terminate Osborne's disability benefits.

Having exhausted his administrative remedies, Osborne filed the instant action on February 24, 2012. The parties subsequently filed cross-motions for summary judgment. Osborne argues that summary judgment should be granted because the denial of benefits was an abuse of discretion by Hartford. In the alternative, Osborne argues that the case should be remanded to Hartford for a full and fair review. In response, Hartford contends that its termination of benefits should be upheld by this court and that Osborne's motion for summary judgment should be denied. The court held a hearing on the parties' motions on July 26, 2012. The motions have been fully briefed and are ripe for review.

### Standard of Review

The parties agree that the Plan grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" (AR 992) and, thus, that Hartford's decision is reviewed for abuse of discretion. See DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011). Under this standard, an administrator's decision will

not be disturbed unless it is unreasonable. Id. To be reasonable, the decision must be "the result of a deliberate principled reasoning process" and be "supported by substantial evidence." Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997) (internal quotation marks omitted). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984) (internal quotation marks omitted).

In Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335 (4th Cir. 2000), the United States Court of Appeals for the Fourth Circuit set forth eight nonexclusive factors to be considered by courts in reviewing a plan administrator's decision for reasonableness:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Id. at 343-343. These factors continue to guide the court's abuse-of-discretion review under ERISA. See DuPerry, 632 F.3d at 869.

### Discussion

Applying the factors set forth in Booth, the court agrees with Osborne that Hartford abused its discretion in terminating Osborne's long-term disability and waiver of premium benefits. In reaching this decision, the court focuses primarily on the language of the Plan, the sufficiency of the evidence upon which Hartford based its conclusion that Osborne no longer qualifies for disability benefits, and the reasonableness of Hartford's decision-making process.

The court begins with the language of the Plan. In order to be considered "disabled" under the Plan, Osborne was required to demonstrate that he is "prevented from performing one or more of the Essential Duties of Any Occupation." (AR 993.) The Plan defines "Any Occupation" as "an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance." (Id.) The Plan defines "Essential Dut[ies]" to include the ability "[t]o be at work for the number of hours in your regularly scheduled workweek . . . ." (Id.) Thus, Osborne's case turned on the question of whether he was able to perform the essential duties of Any Occupation, as defined by the Plan, on a full-time basis. See Alexander v. Hartford Life & Accident Ins. Co., 347 F. App'x 123, 125 (5th Cir. 2009) ("To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty. Thus, whether Alexander was disabled depends on whether she was capable of fulfilling the essential duties of [the particular] type of job . . . on a full-time basis.").

As set forth above, Hartford's decision that Osborne no longer satisfied the Any Occupation standard of disability resulted from its determination that Osborne "is physically capable of performing medium physical-demand-level work on a full-time basis without restriction." (AR 902.) This determination was based on reports from two non-examining physicians, Dr. Brown and Dr. Engstrand. However, neither report provides reliable, persuasive evidence that Osborne can perform medium work, without restriction, on a full-time basis.

At the outset, the court notes that, contrary to Hartford's final decision, Dr. Brown did not specifically opine that Osborne "is capable of sustaining medium physical-demand-level

work on a full-time basis." (AR 902.) While this may be inferred from Dr. Brown's report,[2] the only time that "medium" work was actually mentioned by Dr. Brown was when he described the degree of activity recorded in the surveillance video. Because the video depicted Osborne "performing medium duty manual labor," Dr. Brown questioned the validity of Osborne's subjective complaints of pain. (AR 311.)

Unlike Dr. Brown, Dr. Engstrand did specifically opine that Osborne "can work full-time, consistently, with restrictions no more than medium level work." (AR 11.) However, Dr. Engstrand's opinion was based almost exclusively on the degree of functionality displayed in the surveillance video. Indeed, Dr. Engstrand noted in her report that her opinion was based "especially [on] the video documentation." (AR 12.) While the court acknowledges that the two-hour segment of surveillance footage reveals some discrepancies between Osborne's claimed and observed functionality, it does not provide substantial evidence that Osborne is capable of performing medium-level work on a full-time basis. See Stup v. UNUM Life Ins. Co. of Am., 390 F.3d 301, 309 (4th Cir. 2004) (holding that the results of a functional capacity assessment were not sufficient to establish that the plaintiff could perform sedentary work on a full-time basis, since the assessment "lasted only two and a half hours" and "provide[d] no evidence as to her abilities for a longer period"); Lalli v. Hartford Ins. Co., No. 1:10-cv-00152, 2012 U.S. Dist. LEXIS 23312, at *25 (D. Utah Feb. 23, 2012) (holding that surveillance footage of the plaintiff playing golf did not justify the denial of disability benefits, and emphasizing that "four-and-a-half hours of golf . . . does not equate to a full, eight-hour work-day"); Hanusik v. Hartford Life Ins. Co., No. 06-11258, 2008 U.S. Dist. LEXIS 7520, at *11-12 (E.D. Mich. Jan.

---

[2] As set forth above, the only restrictions identified by Dr. Brown were those resulting from Osborne's carpal tunnel syndrome, namely that Osborne "should not be required to perform continuous, unchanging, repetitive use of the hands for longer than 15 minutes unless allowed a 5 minute break from such use of the hands after every 15 minute period of that activity." (AR 311.)

13

31, 2008) (noting that the plaintiff's functional capacity could not be established on the basis of surveillance footage, which "fail[ed] to show Plaintiff either performing any single or combination of activities for an eight . . . hour period, or strenuously exerting herself over the course of two consecutive days").

Moreover, both Dr. Engstrand and Hartford failed to address the evidence Osborne submitted on appeal, which specifically refuted the non-examining physicians' assessments of Osborne's functional capacity. As set forth above, Dr. Traylor prepared a written statement that expressly addressed the surveillance video. Dr. Traylor noted that she was convinced that Osborne performed the yard work "out of his feelings of being helpless and not being supportive of his family and his neighbors," and that she was confident that Osborne "suffered physically for an extended period of time" after performing the work. (AR 141.) Dr. Traylor further opined that Osborne "may be able to work one or two days but then he might be laid up for several days after that." (Id.)

Osborne also submitted the functional capacity evaluation report prepared by Dr. May, which is the only report of its kind in the record.[3] Based on the results of the evaluation, which lasted eight and a half hours, Dr. May opined that Osborne has a "poor prognosis for returning to the competitive labor market" and that he would be limited to performing restricted light work or sedentary work. (AR 43.)

While Dr. Engstrand listed Dr. Traylor's statement and the functional capacity report in her summary of Osborne's medical records, she ultimately disregarded this evidence in assessing Osborne's functional capacity. Indeed, her final assessment makes no mention of either document, and instead relies on the two-hour surveillance footage to support the notion that

---

[3] After reviewing the surveillance video, Dr. Traylor recommended that Hartford refer Osborne for a functional capacity evaluation. However, Hartford elected not to do so.

14

Osborne is capable of performing medium work on a full-time basis. Likewise, in its final decision to terminate Osborne's disability benefits, Hartford relies exclusively on Dr. Engstrand's opinion, without discussing Dr. Traylor's comments regarding the surveillance video or the results of Dr. May's functional capacity evaluation.[4]

Hartford's "failure to seriously engage in a discussion" of Osborne's favorable evidence provides further support for the conclusion that Hartford abused its discretion in terminating Osborne's benefits. White v. Eaton Corp. Short Term Disability Plan, 308 F. App'x 713 (4th Cir. 2009); see also Donovan v. Eaton Corp., 462 F.3d 321, 329 (4th Cir. 2006) (finding an abuse of discretion where there was a "wholesale disregard" of evidence in the claimant's favor); Glenn v. Metro. Life Ins. Co., 461 F.3d 660, 672 (6th Cir. 2006) (emphasizing that "the failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious"); Harris v. Holland, 87 F. App'x 851, 859 (4th Cir. 2004) (holding that the trustees of the pension plan abused their discretion in denying plaintiffs' claim for disability benefits, where they "apparently gave no consideration" to an opinion provided by a treating physician, which directly addressed one of the issues in dispute). Although the court cannot and does not mandate that Hartford accord special weight to the views of a claimant's treating physicians or other evidence submitted by the claimant, Hartford is not entitled to "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating

---

[4] In Hartford's brief in support of its motion for summary judgment, Hartford suggests that Dr. May's report bolsters its decision to terminate Osborne's disability benefits. See Docket No. 11 at 17 ("[E]ven Dr. May found that Osborne could perform light work in a restricted work plane or sedentary work."). This argument, however, is without merit. As Osborne emphasized at the hearing, the ability to perform sedentary work or restricted light work does not automatically establish that Osborne is ineligible for disability benefits. Instead, Osborne's eligibility for benefits hinges on whether he is able to perform the Essential Duties of Any Occupation, as those terms are defined in the Plan. At this time, Hartford has not performed an employability analysis to determine whether there are Any Occupations that Osborne could perform and which would meet the requisite earnings potential, if Osborne is limited to sedentary or restricted light work.

physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). In this case, Hartford's final decision suggests that it simply decided to ignore the new evidence submitted by Osborne, which directly addressed the issue of his functional capacity, and the decision fails to provide any basis for doing so. On this record, the court is simply unable to conclude that Hartford followed a reasoned decisionmaking process or that it presented substantial evidence to support its determination that Osborne is capable of performing unrestricted medium work on a full-time basis.

For the reasons stated, the court concludes that the termination of Osborne's benefits amounted to an abuse of discretion. When a plan administrator has abused its discretion, the court may either reverse the decision or remand it to the administrator for further review. See DuPerry, 632 F.3d at 875-876; Elliott v. Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999). While the Fourth Circuit has cautioned that "remand should be used sparingly," the Court has recognized that "remand is most appropriate where the plan itself commits the [plan administrators] to consider relevant information which they failed to consider . . . ." Elliott, 190 F.3d at 609 (internal citations omitted). Likewise, "[i]f the plan administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision, then the proper remedy is to remand the case for further findings or additional explanation." Gorski v. ITT Long Term Disability Plan for Salaried Employees, 314 F. App'x 540, 548 (4th Cir. 2008) (internal citations omitted).

In light of the court's decision that Hartford failed to consider relevant evidence pertaining to Osborne's functional capacity, the court is convinced that remand is the appropriate remedy. Accordingly, the case will be remanded for a full and fair review of Osborne's

functional capacity and its impact on his ability to perform Any Occupation, as that term is defined in the Plan.

## Conclusion

For the reasons stated, the parties' motions for summary judgment will be denied, and the case will be remanded to Hartford for further administrative proceedings. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 17th day of September, 2012.

_____
Chief United States District Judge